CHARLES S. DAVIS, SUCCESSOR TRUSTEE U/W AND OF THE ESTATE OF OTTO ERNST ISENBERG, DECEASED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HELEN L. ISENBERG TRUST, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

PAUL OTTO ISENBERG TRUST, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 74249, 71373, 71374. Promulgated April 27, 1937.

*F. Eberhart Haynes, Esq., J. Marvin Haynes, Esq.,* and *Ebert J. Botts, Esq.,* for the petitioners.

*J. L. Backstrom, Esq.,* for the respondent.

1008

1012

OPINION.

Morris: Petitioner Davis received $387,406.40 on June 21, 1929, being the sum of a judgment for $287,323.40 rendered against the Trust Co. growing out of the sale by the Alien Property Custodian on January 17, 1919, of certain corporate shares—500 shares in which the decedent's widow had a life interest and 170 shares seized as the property of Paul—and $100,083, being the amount of interest upon such judgment as found by the court to be due. The first and principal issue relates to the inclusion of this judgment money in taxable income for the year in which received.

The argument of the petitioner, in the main, is that the negligence for which damages were awarded did not consist in the "selling" of the 670 shares of Kekaha stock but in the breach of trust by the trustee in failing to prevent the Alien Property Custodian from selling said stock. Therefore, since the income in question did not arise from the sale of the stock in 1919, the amount sought to be taxed was not "derived from capital, from labor, or from both combined", hence, not "income" within the definition of *Eisner* v. *Macomber*, 252 U. S. 189.

The petitioners rely strongly upon *Farmers & Merchants Bank of Catlettsburg* v. *Commissioner*, 59 Fed. (2d) 912, reversing the Board at 20 B. T. A. 622. It was the custom of the petitioner in that case, a banking institution, to make a charge for the collection of checks on foreign banks and those drawn on it and sent from

other banks. The petitioner was not a member of the Federal Reserve System so that checks drawn on it instead of being cleared through the Reserve Bank were sent directly to it by the holding bank and paid by drafts on Cincinnati or New York. In 1920 the Reserve Bank demanded that the petitioner clear checks at par. Having refused this demand the Reserve Bank notified its members that it would collect without charge all checks sent to it and drawn on the petitioner. Its method was to employ agents who would appear daily at the bank with these checks and demand payment in cash. This practice was followed about eighteen months. During a greater portion of the time collections were effected in such an unusual and unbusinesslike manner as to attract unfavorable public comment and the petitioner claimed that it was thereby "annoyed, embarrassed, and interfered with in the conduct of its affairs." It brought an action against the Reserve Bank for damages alleged to have been sustained by reason of these tactics, alleging, particularly, that by reason of the wrongful conduct of the Reserve Bank it had been forced to procure and keep in its vaults and with its correspondents unusually large amounts of money; that it had lost the earning power of a great deal of money; that it had lost deposits and depositors, and had failed to gain new ones; that it had been unable to grow and develop new business; and that it had been permanently injured in its reputation, standing, growth and prosperity. Claim for exemplary damages was also asserted. The action was finally compromised in 1925, the petitioner receiving a money judgment which the respondent here held to be taxable income. The Board sustained the respondent, primarily because of the failure of proof. The court found that the petitioner's action was not predicated upon the loss of profits, as the Board said, but that its claim for damages was based upon "an alleged tortuous injury to the good will of its business"; that "gravamen of petitioner's action  *  *  * was the injury inflicted to its banking business generally, and that the true measure of damages was compensation to be determined by ascertaining how much less valuable its business was by reason of the wrongful acts." In conclusion, the court said: "One may be recompensed for an injury but it is a rare case in which one should have a profit out of it", and it held that the amount so received should not have been treated as taxable income.

Thus, in substantial effect, the court there found that a loss in capital had been sustained by the bank and that the amount received by it constituted a restoration of that loss rather than income upon which the statute might levy a tax. We do not understand the court's opinion to go so far as to hold that a known profit, susceptible of accurate determination under the terms of the taxing statute—a profit which, under normal circumstances would have been taxed—would

be exempt from taxation merely because it was derived from a suit for and was denominated by the court as "damages."

In *Central Railroad Co. of New Jersey* v. *Commissioner*, 79 Fed. (2d) 697, reversing the Board at 29 B. T. A. 14, one Joyce had been the executive officer of the railroad for a number of years in charge of its marine department. While such an official and in the employ of the railroad, Joyce and another organized certain other corporations and through such corporations "surreptitiously carried on business operations which were adverse to the interests" of the railroad. It was found that those corporations, without disclosing Joyce's relationship, therewith, had been enabled to make advantageous leases and contracts with the railroad for his benefit. The railroad brought a suit in equity against Joyce and one of his corporate interests on the ground of conspiracy to defraud it and sought an accounting of the profits earned by such corporations or for the recovery of damages sustained by the taxpayer in entering into contracts and agreements therewith. The suit was settled in 1928, the railroad receiving property of considerable value, consisting of certain structures, equipment, and appurtenances which were located on property leased by one of the corporations from the railroad for a term of years. The Board sustained the respondent in his determination that the value of the property so received should have been included in taxable income and in this it was reversed. The court, after reviewing the several instances in which recoveries, such as alimony and separation allowances (*Gould* v. *Gould*, 245 U. S. 151), and compensation for injuries or sickness (expressly exempted by section 22 (b) of the Revenue Act of 1928) are not subjected to the tax and holding that the value of this property was likewise not includable in taxable income, said:

* * * It was a penalty imposed by the law on a faithless fiduciary, a gain granted gratuitously because of the necessity of keeping persons in positions of trust beyond the temptation of double dealing. It cannot be said that it was derived wholly or in part from the use of the taxpayer's capital or labor. The nearest that one can come to that is to say that Joyce and his dummies could not have operated but for Joyce's position with the taxpayer and its type of business. But Joyce's ultra vires operations were not carried on by the use of the taxpayer's capital and labor. They were entirely separate and apart from its business structure.

Moreover, the settlement was not based on a suit by the taxpayer to recover profits of which it had been deprived.

"*Farmers & Merchants Bank* recognizes the priciple that damages recovered for the loss of profits are taxable just as profits made in the regular course of business." *Central Railroad Co. of New Jersey*, *supra*. As we view the proceedings out of which the damages in question arose, the avowed purpose of the court was to restore to the trust the 670 shares of stock which had been wrongfully sold or in

lieu thereof money damages which would restore the corpus to its value had there been no breach of trust and had the sale not taken place in 1919. In substantial, if not in real effect, the money damages received in lieu of stock constituted recovery "for the loss of profits" which would otherwise have been derived by the trust had the stock itself been received and sold in 1929 instead of in 1919. It is true that from the point of view of the court adjudicating that cause for damages, decedent's estate and its beneficiaries were faced with a loss by reason of that wrongful sale in 1919, but such loss would have been due not to the sale of such shares of stock below their cost or their taxable base, but to the failure to realize the appreciation that had taken place in the value of the stock. The amount awarded represented the realization of that appreciation. If, of course, the Trust Co. had purchased the shares of stock in the open market, under the court's decree, and had restored them to the trust, instead of paying cash, as it did, different considerations would be here involved. Cash having been received, the transaction in practical effect is as though the stock had been restored and in turn sold by the trust at a profit. See *Armstrong Knitting Mills*, 19 B. T. A. 318.

The definition of gross income in section 22 of the Revenue Act of 1928 is extremely broad. It "includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever." Therefore, once satisfied that there has been a "gain or profit" as measured by the taxing statute, it must be included in gross income. Even under the much narrower definition in *Eisner* v. *Macomber*, *supra*, the amount in question, derived as it was from the ownership of "capital", in the form of corporate shares, falls squarely within that definition.

Examination of *Koninklijke Hollandische Lloyd*, 34 B. T. A. 830, convinces us of its inapplicability. The Board there merely held that the "damages" awarded to the petitioner, a foreign corporation, did not fall within the very limited scope of the statute applying to the income of such foreign corporations from sources within the United States, hence, could not be taxed, saying:

Section 119 contains no definition of income of a general or all-inclusive nature such as is found in section 22 (a) and, therefore, the income shown to be taxed must come strictly within the limits of the statutory requirements.

In other words the Board merely found that the damages received did not fall within the classification of interest, dividends, personal services, rentals, and royalties, nor sale of property, and, so finding, it had no alternative except to hold that such amount was not income within the meaning of the statute.

Upon the first and main issue we sustain the respondent's determination.

The second assignment of error is that if the respondent did not err in taxing the aforesaid $287,323.40, he did err in failing to determine that because the income of the trust is distributable annually or oftener the said income is deductible by the trust and taxable to the beneficiaries, relying upon section 162 (b) of the Revenue Act of 1928, which provides in part as follows:

The net income of the estate or trust shall be computed in the same manner and on the same basis as in the case of an individual, except that—

\* \* \* \* \* \* \*

(b) There shall be allowed as an additional deduction in computing the net income of the estate or trust the amount of the income of the estate or trust for its taxable year which is to be distributed currently by the fiduciary to the beneficiaries, and the amount of the income collected by a guardian of an infant which is to be held or distributed as the court may direct, but the amount so allowed as a deduction shall be included in computing the net income of the beneficiaries whether distributed to them or not. Any amount allowed as a deduction under this paragraph shall not be allowed as a deduction under subsection (c) of this section in the same or any succeeding taxable year.

In short it is contended that this amount should be taxed to the beneficiaries and not to the trust.

That this sum of $287,323.40 (received in lieu of restoration of the stock itself), less $32,723.40 described as "surcharge" and representing dividends lost because of the sale of the stock, constituted corpus of the estate—as distinguished from income therefrom which would be distributable to the beneficiaries "annually or oftener" under the will of the decedent—is established, we are convinced, in sound reason and upon authority. Had a sale of this stock been made voluntarily by the trustee, certainly no one could contend effectively that the proceeds therefrom constituted income under the will and therefore were distributable to the beneficiaries. To so hold would have resulted in the distribution of the estate corpus prior to the fulfillment of the conditions specified by the decedent and would be in obvious violation of his expressed wishes. The proceeds from the sale of capital stock which was a part of the corpus, just as any other asset of an estate, not otherwise classified by the terms of the decedent's will or by the terms of the statute governing its administration, became a part of the corpus of the estate and must be so treated. We have been cited to no authority

1018

of Hawaii, nor do we find any, which would justify the application of a different principle from that enunciated in *Estate of Richard O'Brien*, 31 B. T. A. 149. Furthermore, no actual distribution of the sum received was actually made within the taxable period to the beneficiaries, nor was any specific sum set aside for them by the trustee. It "must be borne in mind that a trust in rendering its income for taxation can only deduct income which has been actually distributed or properly credited to the beneficiaries, or such income as is mandatorily distributable currently by the fiduciary to the beneficiaries." *Estate of Richard O'Brien, supra.*

The facts and circumstances and the issues presented in *Mary Clark de Brabant*, 34 B. T. A. 951, are entirely different from those presented here. In that case the Board held that an amount withheld from distribution by the trustee pending litigation to determine whether such amount constituted corpus of the trust or income, was distributable income taxable to the beneficiary for the year when "mandatorily" distributable by the trustee, whether distributed in such year or not.

The petitioner is sustained as to the deductibility by the trust of $32,723.40, which represented dividends. It was, therefore, income of the trust, which was distributable under the will.

It is the "alternative" allegation and contention of the petitioner that ten separate trust estates were created by the will of the decedent—not one, as the respondent contends—and that "the income in question [presumably the same said $287,323.40] is taxable to ten separate trusts", such trust estates being one for the widow as to one-third of the estate and one for each of the nine children as to two-thirds thereof.

The arguments of both parties contain words and phrases extracted from the decision of the Court of Hawaii and of the Ninth Circuit Court of Appeals as they tend to evidence the views of the courts as to whether there was only one or several trusts. We do not find that this question was ever before those courts for consideration in any of the various proceedings and, therefore, words used in their determinations of other questions presented will be of little help to us. Therefore, we shall confine our consideration to an interpretation of the will itself. However, it may be said, in passing, that if we were called upon for a decision based upon the manner in which the courts have treated this question we would, nevertheless, be of the same opinion that we hereinafter reach. See *Isenberg* v. *Trent Trust Co.*, 28 Haw. 590; 26 Fed. (2d) 609; 31 Fed. (2d) 553.

In the first place, the most potent factor of all in construing the intention of the testator lies in the fact that he did not, as he may well have done, and doubtless would have had he entertained the views urged upon us by the present petitioners, expressly declare

separate trusts. Furthermore—and this, too, is of the essence since the burden of proof is upon the petitioner—we find no motive whatsoever on the part of the testator, in the proof before us, for creating ten separate trusts instead of one for the benefit of ten separate beneficiaries.

We find from the instrument itself that the testator, in simple terms, declared "all" of his property "In Trust * * * for the following uses and purposes." In the paragraphs that follow this simple declaration he very briefly and, in our opinion, clearly set forth those "uses and purposes." His purpose, of course, was to provide a suitable annual income for his wife for her lifetime and for his children until they became 25 years of age, also the ultimate division of the entire trust corpus among his children. Judging from the conciseness with which his will was drafted he seems to have cared little for the mechanics by which this purpose was to be accomplished. True, he directed, among the uses and purposes provisions of his will, that one-third of the estate (the entirety of which had already been declared in a single trust) should be "set apart" for the "use and benefit" of his wife and that the remaining two-thirds, his trustees should "divide * * * into as many equal portions" as there were children, but these words alone, without others showing an intention to establish separate trusts as to each portion to be set apart or divided, merely express the quantum to which each beneficiary of the principal trust should be entitled. That this is the logical view is supported by the provision of the testator that none of his children should receive his or her portion of the "principal trust property" until reaching the age of 25. Otherwise, if the testator had intended ten separate trusts instead of only one, with one trust res, he might just as well have referred to the "portion", omitting any reference to the "principal trust property." It is also significant to note that the testator in the provision empowering the trustees to sell referred not to the property of several trusts, but merely to "the trust property." Furthermore, notwithstanding some inferences to the contrary, it does not appear that there was any physical apportionment by the trustees under the will, for if there had been, it would have been entirely unnecessary for the trustees to have called upon the court in 1905 for an apportionment in order that distribution could be made to some of the beneficiaries who had qualified under the will. Indeed, the trustees themselves appear to have always regarded the trust with a singleness of purpose.

Upon the foregoing issue we hold that there was but a single trust. Cf. *Charles B. Van Dusen et al., Trustees*, 33 B. T. A. 662; *Huntington National Bank, Trustee*, 32 B. T. A. 342; *J. C. Wynne et al., Trustees*, 28 B. T. A. 125; affd., 77 Fed. (2d) 473; and *Johnson* v. *United States*, 65 Ct. Cls. 285; certiorari denied, 278 U. S. 611.

The petitioner alleges and contends that if the respondent did not so err as in the preceding issues disposed of, he erred in his determination that certain of those shares which we have been discussing were not the separate and private property of Paul and the decedent's widow, and that the income therefrom should be taxed to their separate estates. We find it unnecessary to dwell upon the subject at length. The Circuit Court of Appeals for the Ninth Circuit in *Isenberg* v. *Trent Trust Co.*, *supra*, speaking of the 670 shares of Kekaha Sugar under consideration, said:

The Circuit Court [of Hawaii] found that the stock was part of the trust estate, and that at the time of the accounting it should have been in the appellee's [Trust Co.] possession as trustee, and that it had been lost to the estate, through its negligence in failing to reduce it to possession.

These 670 shares having been held to be the property of the trust estate by the Circuit Court of Hawaii and that court having been sustained in its view by the United States Circuit Court of Appeals, it follows that those shares could not have been the private property of Paul or the widow. The respondent is sustained upon this issue.

Error is alleged in the failure to allow the trust estate to deduct litigation expenses in 1929 aggregating $108,202.38, paid for the recovery of the damages hereinbefore discussed. This claim is based upon the action of the court when it, on January 12, 1931, directed the distribution of the damages to the beneficiaries, saying:

That large sums of money have been expended by the beneficiaries in the matter of the litigation to recover property for the trust estate and that said litigation was for the benefit of said estate and for all beneficiaries and that said expenditures should be borne by them in proportion to their respective interests.

Four hundred seventy-three dollars and twenty cents of that amount was paid by the estate in 1929 as a commission to the trustee "on income collected in the year 1929", but since this amount has not been specifically pleaded we shall not pass upon its deductibility.

The remainder of said sum of $108,202.38, it appears, was paid by the various beneficiaries or their representatives beginning with 1921 up to the year 1930. No part, however, was paid by the trust in the taxable year 1929. All that the court determined was that large sums had been expended by the beneficiaries and that such sums should, in the distribution of the amount recovered, be apportioned against the distributions made to the various beneficiaries. So that, it is perfectly clear, the beneficiaries and not the trust incurred and paid the amount sought to be deducted here. Upon this issue the respondent's determination must be approved.

The petitioners allege error in the failure of the respondent "to give credit for taxes paid by the Alien Property Custodian to the Collector at Baltimore" in certain stated amounts for the years

1919 to 1924, both inclusive. The argument advanced is, of course, double taxation.

The taxes for which the petitioner is seeking credit were paid by the Alien Property Custodian on returns prepared by the Bureau for Paul. Regardless of the equities in the petitioners' contention in so far as the present deficiencies are based on income included in those returns, it is obvious that taxes paid for one taxpayer may not be credited against deficiencies of another taxpayer.

The respondent has asserted a penalty of 25 percent for the years 1918 and 1924 to 1929, inclusive, because of the failure of the decedent's estate to file timely returns of income as prescribed by the statute, such returns not having been filed until September 15, 1930.

It is now well settled that where no return is ever filed the 25 percent penalty becomes mandatory (*Scranton, Lackawanna Trust Co., Trustee*, 29 B. T. A. 698; affd., 80 Fed. (2d) 519; certiorari denied, 297 U. S. 723), but where there is no "willful neglect" and where "reasonable cause" for the failure to file is shown, together with the ultimate voluntary filing of proper returns, the penalty should not be asserted. *The Jockey Club*, 30 B. T. A. 670; affd., 76 Fed. (2d) 597.

There is nothing whatsoever in the record before us to indicate that the trust estate was ever under the impression that it was exempt from the filing of returns of income. In fact, it seems that the matter of such returns or of the liability of the estate for taxes to the Federal Government, except in so far as the Government itself took the initiative, was completely ignored until Davis, on March 9, 1930, retained the services of an accountant who investigated and reported to Davis that no returns had been filed for the years 1918 to 1929. Conferences followed with the Bureau of Internal Revenue representatives in an effort to determine what the tax liability was for those years. Having requested an audit by the respondent for this purpose, the trustee was informed, on August 27, 1930, that returns would have to be filed before such a course could be taken. Returns for the years 1918 to 1929, both inclusive, were filed by Davis on September 15, 1930, showing the income—principally interest and dividends—and expenses of the estate.

What constitutes reasonable cause, which we have said "means such a cause as would prompt an ordinarily intelligent and prudent business man to have so acted under similar circumstances" (*Charles E. Pearsall & Son*, 29 B. T. A. 747), must be determined in the light of the facts of each case. Considering all of the facts and circumstances of this particular case, taking into consideration the many complications caused by the seizure of the trust property, the status of the beneficiaries, the negligence of the Trust Co. during its term of office and the litigation which followed, we find no "reasonable

cause" for the failure upon the part of the trust estate to file returns of income for the years prior to 1929. The penalty therefore as to those years must be sustained. See *Berlin* v. *Commissioner*, 59 Fed. (2d) 996, and *Rogers Hornsby*, 26 B. T. A. 591.

We are of the opinion, however, that as to the taxable year 1929 Davis proceeded with due diligence under the circumstances to determine the tax liability of the trust estate and to file returns as required by law. The penalty as to 1929 is, therefore, disapproved.

Docket Nos. 71373 and 71374 pertain to deficiencies of $2,875.03 asserted against each petitioner for the calendar year 1930. The deficiency notices are addressed to "Helen L. Isenberg Trust, c/o Charles S. Davis" and "Paul Otto Isenberg Trust, c/o Charles S. Davis", respectively, and the petitions filed in respect thereto are similarly captioned. Such petitions, verified by said Davis, allege that "The petitioner is an alleged trust estate (so-called by the Commissioner of Internal Revenue), with a Post-Office address c/o Charles S. Davis, Honolulu, Hawaii." In both petitions it is alleged and with respect to both, it is contended that no such petitioners exist. The respondent's deficiency notices state that four returns should have been filed for 1930 "for the estate of Otto Ernst Isenberg" which he proceeds to hold "should not have been taxed as a single taxpayer for the reason that the estate, as such, had been closed by proper probate procedure in 1905." In his brief he states that it was determined in the deficiency notices that the entire income of $35,785.91 for 1930 was taxable "to two trusts and being unable to segregate the income of the two trusts asserted deficiencies for the full amount of the tax or said $35,785.91 against two trusts designated the Helen L. Isenberg Trust and Paul Otto Isenberg Trust."

The respondent's position upon this issue is inconsistent with the position he has taken, in which we have sustained him, respecting the trust of Otto Ernst Isenberg for the years prior to 1930. We have held respecting these prior years that there was but one trust estate operating under the will of Otto Ernst Isenberg, deceased, and that the entire income of the trust is taxable to the trustee thereof. In his brief the respondent says Davis, trustee of the estate of Otto Ernst Isenberg, knew clearly that the income sought to be taxed against the two trusts arose from the property in the estate of Otto Ernst Isenberg, and because he filed petitions the Board should hold that there is a deficiency of $2,875.03 in one of the dockets against said Davis as trustee of the estate of Otto Ernst Isenberg. In other words, what the respondent is now urging us to do is determine a deficiency against the trust of Otto Ernst Isenberg although no notice of deficiency was sent to that trust for 1930 and it is not before us for that year. The fact that the same individual who is

trustee of that trust filed petitions on deficiencies asserted against two different alleged trusts does not justify the finding of a deficiency against that trust, although the income may have belonged. to it. We are satisfied from the facts and argument of counsel that the respondent's determination of deficiencies against the so-called "Helen L. Isenberg Trust" and "Paul Otto Isenberg Trust" is erroneous and the respondent's contention on brief can not be sustained.

Reviewed by the Board.

> *Judgment will be entered under Rule 50 in Docket No. 74249, and judgment of no deficiencies will be entered in Docket Nos. 71373 and 71374.*